UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Case No. 25bk10807 |
|  | ) |  |
| Willie J Jones and Peggy A Rodger-Jones, | ) | Chapter 13 |
|  | ) |  |
| Debtors. | ) | Judge Timothy A. Barnes |
|  | ) |  |

TIMOTHY A. BARNES, Judge.

## MEMORANDUM DECISION AND ORDER

The matter before the court arises out of the Objection to Confirmation of Plan [Dkt. No. 32] (the "Objection"), filed by the City of Chicago (the "City"), objecting to the Chapter 13 Plan (Official Form 113) [Dkt. No. 2] (the "Original Plan") of Willie J Jones and Peggy A Rodger-Jones (the "Debtors").

The Debtors assert that their surrender of the real property located at 6000 S. Paulina St. (the "Property") in their previous chapter 13 case, *In re Jones*, Case No. 10bk04352 (the "2010 Bankruptcy Case"), absolved them of continuing liability related to the Property. The City argues that the Debtors' surrender of the Property in the 2010 Bankruptcy Case did not divest the Debtors of their ownership interest nor absolve them of prospective liability on the Property, and the Plan (defined below) in this case should not be confirmed.

For the reasons stated below, the Objection is sustained.

## JURISDICTION

The federal district courts have "original and exclusive jurisdiction" of all cases under title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"). 28 U.S.C. § 1334(a). The federal district courts also have "original but not exclusive jurisdiction" of all civil proceedings arising under the Bankruptcy Code or arising in or related to cases under the Bankruptcy Code. 28 U.S.C. § 1334(b). District courts may refer these cases to the bankruptcy judges for their districts. 28 U.S.C. § 157(a). In accordance with section 157(a), the District Court for the Northern District of Illinois has referred all its bankruptcy cases to the Bankruptcy Court for the Northern District of Illinois. N.D. Ill. Internal Operating Procedure 15(a).

A bankruptcy judge to whom a case has been referred has statutory authority to enter final judgment on any proceeding arising under the Bankruptcy Code or arising in a case under the Bankruptcy Code. 28 U.S.C. § 157(b)(1). Bankruptcy judges must therefore determine, on motion or *sua sponte*, whether a proceeding is a core proceeding or is otherwise related to a case under the Bankruptcy Code. 28 U.S.C. § 157(b)(3). As to the former, the bankruptcy court may hear and determine such matters. 28 U.S.C. § 157(b)(1). As to the latter, the bankruptcy court may hear the matters but may not decide them without the consent of the parties. 28 U.S.C. §§ 157(b)(1), (c).

1

Absent consent, the bankruptcy court must "submit proposed findings of fact and conclusions of law to the district court, and any final order or judgment shall be entered by the district judge after considering the bankruptcy judge's proposed findings and conclusions and after reviewing *de novo* those matters to which any party has timely and specifically objected." 28 U.S.C. § 157(c)(1).

In addition to the foregoing considerations, a bankruptcy judge must also have constitutional authority to hear and determine a matter. *Stern v. Marshall,* 564 U.S. 464 (2011). Constitutional authority exists when a matter originates under the Bankruptcy Code or, in noncore matters, where the matter is either one that falls within the public rights exception, *id.*, or where the parties have consented, either expressly or impliedly, to the bankruptcy court hearing and determining the matter. *See, e.g., Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. 665, 669 (2015) (parties may consent to a bankruptcy court's jurisdiction); *Richer v. Morehead*, 798 F.3d 487, 490 (7th Cir. 2015) (noting that "implied consent is good enough.").

Plan confirmation and objections thereto may arise in a case only under title 11 and are specified as core matters in which this court has jurisdiction to enter final orders. 28 U.S.C. § 157(b)(2)(B), (E) and (L); *Schiff, Hardin & Waite v. Schuster*, 978 F.2d 1261 (7th Cir. 1992) ("plan confirmation is a core proceeding"); *In re Nicola*, 244 B.R. 795, 796 (Bankr. N.D. Ill. 2000) (Lefkow, J.). Such matters, thus, are within the court's constitutional authority. *Stern*, 131 564 U.S. at 500–01.

Accordingly, final judgment is within the scope of the court's jurisdictional and constitutional authority.

PROCEDURAL HISTORY

In considering the Objection, the court has reviewed and considered the Original Plan and the Objection and the following filed documents in the bankruptcy proceeding:

(1) Schedules (Official Forms 106, *et seq.*) [Dkt. No. 1] (the "Schedules");

(2) Amended Chapter 13 Plan (Official Form 113) [Dkt. No. 24] (the "Amended Plan");

(3) Debtor's Response to Objection to Confirmation of Plan Filed by Creditor City of Chicago [Dkt. No. 39] (the "Response");

(4) Amended Chapter 13 Plan (Official Form 113) [Dkt. No. 40] (the "Further Amended Plan" and, together with the Original Plan and the Amended Plan, the "Plan");

(5) The City of Chicago's Reply in Support of its Objection to Confirmation of Plan [Dkt. No. 47] (the "Reply");

(6) The City of Chicago's Supplemental Brief in Support of its Objection to Confirmation [Dkt. No. 56] (the "City's Brief");

(7) Debtor's Brief in Response to the City of Chicago's Supplemental Brief in Support of its Objection to Confirmation [Dkt. No. 58] (the "Debtors' Brief"); and

(8) The City of Chicago's Reply in Support of its Supplemental Brief to its Objection to Confirmation [Dkt. No. 62] (the "City's Reply Brief").

2

Though the foregoing items do not constitute an exhaustive list of the filings in the bankruptcy case, the court has taken judicial notice of the contents of the dockets in each of these cases. *See Levine v. Egidi*, No. 93C188, 1993 WL 69146, at *2 (N.D. Ill. Mar. 8, 1993) (authorizing a bankruptcy court to take judicial notice of its own docket); *In re Brent*, 458 B.R. 444, 455 n.5 (Bankr. N.D. Ill. 1989) (Goldgar, J.) (recognizing same).

BACKGROUND

On February 4, 2010, the Debtors commenced the 2010 Bankruptcy Case, in which case the Debtors presented their Chapter 13 Plan [Case No. 10bk04352, Dkt. No. 24] (the "2010 Plan").  In the 2010 Plan, the Debtors surrendered their interest in the Property to IndyMac Bank and the City of Chicago Water Department.  Specifically, the 2010 Plan stated:

> [T]he debtors surrender their interest in the property commonly known as 6000 S. Paulina, Chicago, Illinois to the secured lenders thereon (the mortgagee IndyMac Bank or its successor and the City of Chicago Water Department), and said creditors shall look solely to said collateral in payment of their secured claim.

2010 Plan, ¶ G.

Neither IndyMac Bank nor the City of Chicago objected to the 2010 Plan, and, on April 5, 2010, the court entered an order confirming the 2010 Plan.  Order Confirming Chapter 13 Plan [Case No. 10bk04352, Dkt. No. 26].  On December 27, 2013, the court granted the Debtors a discharge in the 2010 Bankruptcy Case.  Discharge of Joint Debtors after Completion of Chapter 13 Plan [Case No. 10bk04352, Dkt. No. 113].

On July 16, 2025, the Debtors filed the above-captioned chapter 13 bankruptcy case.  In section 3.5 of the Original Plan, the Debtors elected to surrender the "lot only" of the Property and explained that while they had previously surrendered the Property in the 2010 Plan, the "Debtors' names remain on title because no lien holder has foreclosed on the property. Debtors hold bare legal title and claim no interest in said property."  Original Plan, § 3.5.  The Debtors also listed the lot of the Property in their Schedules, explaining that: "Debtors' names remain on title because no lien holder has foreclosed on the property.  Debtors hold bare legal title and claim no interest in said property."  Schedule A/B.

On November 10, 2025, the City filed the Objection to the Original Plan.[1]  In the Objection and its subsequent filings, the City argues that the Debtors purport to shift the burdens of property ownership onto the local government.  The City has filed three claims in this case against the Debtors relating to health and safety violations on the Property.

On December 10, 2025, the Debtors amended the Original Plan but made no material change to their treatment of the Property therein.  *See* Amended Plan, § 3.5.  Thereafter, the Debtors

---

[1]    While the Objection was raised with respect to the Original Plan, because the issues raised in the Objection remain unresolved by subsequent amendments, the court considers it here in respect to the Amended Plan as it presently exists.

further amended the Amended Plan, this time no longer treating the Property in any fashion. Further Amended Plan, § 3.5.

Also on December 10, 2025, the Debtors filed the Debtors' Response to the City's Objection. The Debtors' Response asserts, among other things, that because the Debtors surrendered the Property in their 2010 Plan, because the City failed to object to the 2010 Plan and because the Debtors were granted a discharge, the City is now precluded from asserting new claims related to the Property.

On January 15, 2026, the City filed its Reply. In the Reply, the City argues that the Debtors are taking contradictory positions as the Debtors claim they do not own the Property but at the same time, they no longer surrender any interest in the Property in the Further Amended Plan, the result of which being that the Property remains in the estate and protected by the automatic stay in this case.

At a hearing on the confirmation of the Debtor's Plan on January 29, 2026 (the "Confirmation Hearing"), the court heard the parties' arguments. At that hearing, the court requested additional briefing specifically on the effect of the Debtors' surrender of real property in the 2010 Plan. In particular, the court directed the parties to address the possible effect of *Midlantic Nat. Bank v. New Jersey Dep't of Env't Prot.*, 474 U.S. 494 (1986).

As a result, on February 11, 2026, the City filed the City's Brief, again arguing that surrender alone under section 1325(a)(5)(C) of the Bankruptcy Code does not affect a debtor's ownership of real property, and unless that debtor attempts to vest title in another entity under section 1322(b)(9), title remains with the debtor. The City's Brief also asserted that *Midlantic* placed further restrictions on the Debtors such that they cannot divest themselves of ownership of the Property in the manner in which they have sought to do so.

On March 5, 2026, the Debtors filed the Debtors' Brief in response. In the Debtors' Brief, the Debtors argue, among other things, that the City's discussion of "vesting" is immaterial and the Debtors cannot be held personally liable for any violations related to a property after they have surrendered it and received a discharge. The Debtors also assert that *Midlantic* has no application to the Debtors' right to surrender property to a secured creditor under section 1325, because Congress has not expressed such a limitation.

On March 19, 2026, the City filed its reply in support of its supplemental brief. In the City's Reply Brief, the City argues that the Debtors have not cited authority holding that surrender transfers ownership or absolves debtors of ownership liability, and that the Debtors' discharge in the 2010 Bankruptcy Case did not shield them from future claims. The City's Reply Brief also introduced new arguments beyond the scope of the specific question presented by the court at the Confirmation Hearing. Those arguments will not be addressed in this Memorandum Decision. *U.S. v. Scott*, 784 F.2d 787, 789 n.1 (7th Cir. 1986) ("[N]ew issues cannot be raised in a reply brief.").

At the Confirmation Hearing, the court noted that at the conclusion of the aforementioned briefing, the matter would be taken under advisement. This Memorandum Decision resolves the matter under advisement—the narrow issue described below.

4

DISCUSSION

In this case, the narrow issue is whether the Debtors' surrender of the Property in the 2010 Plan, combined with their discharge from the 2010 Bankruptcy Case, changed their ownership status and released them from any liabilities associated with owning the Property. Put differently, absent vesting title of the Property in a third party, are the Debtors responsible for *in personam* liabilities incident to ownership stemming from the Property after their surrender of the Property in the 2010 Plan and receipt of their discharge?

This, first and foremost, calls into question the effect of the surrender in the 2010 Plan.

A.      The Effect of Surrender

The term "surrender" is a not defined term in the Bankruptcy Code but is used in section 1325 of the Bankruptcy Code as one of the options for disposition of estate property. 11 U.S.C. § 1325. Section 1325 governs the confirmation of a chapter 13 plan and directs the court to confirm a plan if, with respect to each allowed secured claim provided for by the plan, one of three requirements is met: (A) "the holder of such claim has accepted the plan;" (B) if the secured lienholder retains its lien and the plan provides certain protections; and (C) "the debtor *surrenders* the property securing such claim to such holder." *Id.* (emphasis added).

As surrender is not defined in the Bankruptcy Code, the use of the term in section 1325 has given rise to much understandable confusion. Outside of bankruptcy, surrender is considered to be a method of resolving contractual liability, governed by state law. *See Ervan v. Axos Bank*, Case No. 25-CV-05180, 2026 WL 821955 at *5 (N.D. Ill. Mar. 25, 2026); *see also In re Robertson*, 72 B.R. 2, 4 (Bankr. D. Colo. 1985) (stating that 'surrender' is a contractual act and occurs as a result of the consent of both parties); *In re Zak*, 361 B.R. 481, 486 (Bankr. N.D. Ohio 2007) (relying on *Robertson*). The *Robertson* court noted the similarity between abandonment and surrender, noting that while "an abandonment may include a surrender …, a surrender may not necessarily constitute a total abandonment." *Robertson*, 72 B.R. at 4. In Illinois, at least one court has observed that a "surrender must be by mutual agreement of the parties." *Hoerdt v. Hahne*, 91 Ill. App. 514, 520 (Ill. App. Ct. 1900).

This court previously attempted to dispel some of that confusion in *In re Ware*, 533 B.R. 701 (Bankr. N.D. Ill. 2015) (Barnes, J.). There, the court found that the Oxford English Dictionary defined "surrender" as "[t]he giving up by a bankrupt of his property to his creditors or their assignees," and that Black's Law Dictionary defined it as, among other things, the "giving up of a right or claim." *Id.* at 706. In *Ware*, the court defined "surrender" as the relinquishment of all the rights the debtor has in the collateral, thereby allowing the creditor to take possession of the property, but not requiring delivery of the collateral to the creditor. *Id.*

Other bankruptcy courts have similarly defined "surrender." *See In re Sherwood*, Case No. 15-10637 (JLG), 2016 WL 355520 at *3 (Bankr. S.D.N.Y. Jan. 28, 2016) ("In order to surrender property under section 1325(a)(5)(C), a debtor does not need to deliver physical possession of the collateral; instead, the debtor need only 'make the collateral available to the secured creditor.'"); *In re Williams*, 542 B.R. 514, 518 (Bankr. D. Kan. 2015) ("'Surrender' has been described as the relinquishment of all rights in property, including the right to possess the collateral."); *In re Rosa*, 495 B.R. 522, 523 (Bankr. D. Haw. 2013) ("Rather, 'surrender' means only that the debtor will make the

5

collateral available so the secured creditor can, if it chooses to do so, exercise its state law rights in the collateral.").

In bankruptcy, surrender is properly seen as a claims mechanism, not a transfer one. *See*, *e.g.*, *In re Redante*, 579 B.R. 354, 364 (Bankr. E.D. Pa. 2018) ("Surrender merely opens the door, but does not change property rights."); *In re Gollnitz*, 456 B.R. 733, 736 (Bankr. W.D.N.Y. 2011) ("Authorization for surrender does not constitute a transfer of title. Rather, transfer requires both the surrender of an interest and its acceptance."); *Vlasic v. Equifax Credit Info. Servs.*, Case No. 03 C 4044, 2004 WL 1381031 at *3 (N.D. Ill. May 11, 2004) (holding that a debtor's intent to surrender real property, on its own, does not transfer title in that property.).

For surrender to also act as a transfer mechanism, the creditor in question must accept it as such. *See Sherwood*, 2016 WL 355520, at *3; *In re Canning*, 442 B.R. 165, 172 (Bankr. D. Me. 2011) ("Though the Code provides debtors with a surrender option, it does not force creditors to assume ownership or take possession of collateral."); *In re White*, 282 B.R. 418, 423 (Bankr. N.D. Ohio 2002) ("The Code does not provide for the court or the debtor to direct the means by which the secured creditor deals with the surrendered property."); *In re Service*, 155 B.R. 512, 515 (Bankr. E.D. Mo. 1993) ("The Court cannot compel acceptance of surrendered property.").

This is in keeping with applicable state law, which the Supreme Court has made clear governs interests in property. *Butner v. U.S.*, 440 U.S. 48, 55 (1979); *Willut v. Heuer*, Case No. 21-CV-1147-PP, 2022 WL 2657136 at *2 (E.D. Wis. July 8, 2022) (*quoting Oregon ex rel. State Land Bd. v. Corvallis Sand & Gravel Co.*, 429 U.S. 363, 378 (1977)) ("the Supreme Court has long held that '[u]nder our federal system, property ownership is not governed by a general federal law, but rather by the laws of the several States.'").

In Illinois, the courts have made clear that surrender requires voluntary acceptance. *Hoerdt*, 91 Ill. App. at 520; *accord Est. of Gabbett v. Ray*, 352 Ill. App. 3d 900, 903–04 (2004) (finding that conveyance of real property requires delivery by the grantor and acceptance by the grantee). Illinois law therefore requires the recipient's willingness to accept such a transfer. A wholesale abandonment of state law by using "the Code to unilaterally vest title in a secured creditor by fiat" would, on the other hand, "eviscerate . . . accepted state law requirements." *In re Rose*, 512 B.R. 790, 795 (Bankr. W.D.N.C. 2014). It could only be done with clear intent by Congress. *See In re Hicks*, 653 B.R. 562, 567 (Bankr. N.D. Ill. 2023) (Barnes, J.). For the Bankruptcy Code to alter such rights or preempt applicable state law, there must be a clear indication of Congress's intent to do so. *Id.* The court finds no evidence of such an intent by Congress. In fact, the Bankruptcy Code as a whole presents a scheme of preserving creditors' rights. *Zair*, 550 B.R. at 203–04; *Watt*, 2015 WL 1879680 at *6. Nothing in the Bankruptcy Code suggests that a debtor has the right to forcibly vest title of surrendered property in the secured creditor, and this court is not inclined "to graft into the Code a right or remedy not granted by Congress." *In re Cano*, 410 B.R. 506, 518 (Bankr. S.D. Tex. 2009); *see also In re Franklin*, 284 B.R. 739, 745 (Bankr. D.N.M. 2002) ("As previously observed, a bankruptcy court cannot create substantive rights beyond the parameters of the Bankruptcy Code.").

When a debtor invokes section 1325, therefore, the debtor is using a claims mechanism to address a creditor's claim. 11 U.S.C. § 1325(a)(5)(C). When invoked, the debtor is free to treat the secured creditor's claim as satisfied. *In re Dennett*, 548 B.R. 733, 738 (Bankr. N.D. Tex. 2016) ("Surrendering the property under § 1325(a)(5)(C) must, therefore, by definition satisfy the secured claim."). However, as surrender is a claims mechanism, any additional effect such as a transfer

should only occur with the creditor's consent.  Such is the law of surrender, both in and out of bankruptcy.

This means that a debtor who surrenders a car, such as happened in *Ware*, to a secured creditor is free to treat the creditor's claim as satisfied thereby.  Assuming the Debtor also obtains a discharge, such a creditor's claims may thereafter only be satisfied from the car itself.  That creditor might overtly accept the surrender or accept it through conduct, such as repossession and foreclosure, but is not required to do so.  The creditor is free not to accept the surrender, in which case the collateral remains the debtor's.  Assuming the plan is confirmed and the discharge results, the claim, on the other hand, may only be satisfied from the collateral.  *Davis v. U.S. Bank (In re Davis)*, 778 F.3d 809, 813 (9th Cir. 2015) ("A creditor retains a right to payment, enforceable *in rem*, on the unsecured portion of a loan for which *in personam* liability may have been discharged.").  Put another way, surrender is a claims resolution mechanism that, without acceptance by the creditor, does nothing to transfer the collateral.

It is not consistent with the definition of surrender both under state law and federal usage for such acceptance to be imposed on the creditor.  Surrender simply is not a transfer mechanism unless a creditor accepts it as such.  As such, implied acceptance by failure to object would be deemed acceptance only to the claims treatment aspect of the claim, not the transfer.  To hold otherwise would permit a debtor to treat surrender as a more powerful mechanism than it actually is and to cause it to operate in ways contrary to its state law analog.

This court therefore agrees that surrender alone does not transfer a debtor's interests, for a variety of reasons.

First, as discussed above, for surrender to transfer an interest, the transfer must be agreed upon by the parties.  It requires both a debtor's intention to give up its interests *and* the recipient's agreement to take on those very same interests.  Without both, surrender does not transfer anything.  This does not mean that a debtor may not continue to treat the claim as satisfied by the surrender.

Second, as is also noted above, transfer by forced surrender as a transfer mechanism is simply inconsistent with the law of surrender.  It is also anathema to the way that the Bankruptcy Code treats secured creditors generally.  As one court has held, compelling a secured creditor to accept surrendered property does not work for multiple reasons.  First, forcing a secured creditor to accept title to real property would open "a Pandora's box of possible injuries to lenders." *Rose*, 512 B.R. 790 at 795.  It would compel the creditor to assume the debtor's existing burdens of ownership, including insurance and property taxes. *Id.* at 765.  "Second, if the property is subject to multiple encumbrances, requiring a senior lender to accept title to its collateral would destroy that lender's priority lien position vis a vis junior mortgages, liens, and accrued HOA obligations." *Id.*  Finally, if the property is subject to environmental contamination, or is "dilapidated, damaged, or otherwise a public nuisance," the creditor could inherit these personal liabilities as well. *Id.*

Forcing a secured creditor through surrender to take on the debtor's liabilities incident to ownership contradicts the purpose of section 1325—to protect and preserve the full value of the secured creditor's interest in collateral.  *See In re Bulson*, 327 B.R. 830, 847 (Bankr. W.D. Mich. 2005) ("Section 1325(a)(5) protects secured creditors who…are to have their rights modified by the debtor's plan pursuant to Section 1322(b)[].");  *In re Owens*, 120 B.R. 487, 490 (Bankr. E.D. Ark. 1990) ("Section 1325 entitles a creditor to protection of the value of its allowed secured claim.");  *In*

7

*re Graham*, 123 B.R. 330, 332 (Bankr. W.D. Mo. 1990) ("Section 1325 recognizes and preserves the rights of secured creditors.").

Third, treating section 1325 as a transfer mechanism flies in the face of the structure and express provisions of the Bankruptcy Code. Section 1325 is, by its own express terms, a provision directing how a plan must treat the claims of secured creditors. It sets conditions on what treatments are available. It does not, in and of itself, effectuate that treatment. When Congress addressed a transfer of an interest under a chapter 13 plan, it did so with the term "vest."

Bankruptcy courts have defined "vesting" as a transfer of ownership. *See In re Tosi*, 546 B.R. 487, 493 (Bankr. D. Mass. 2016) ("[T]o vest property in another…is to effect a transfer of ownership of that property from the estate to another person or entity."); *Bank of New York Mellon v. Watt (In re Watt)*, No. 3:14-CV-02051-AA, 2015 WL 1879680, at *4 (D. Or. Apr. 22, 2015) ("Unlike surrender, 'vesting…includes a present transfer of ownership.'") (*quoting Rosa*, 495 B.R. at 524); *Rosa*, 495 B.R. at 524 ("The plain meaning of 'vesting' includes a present transfer of ownership."). This is consistent with the common legal usage of the term vest. The Oxford English Dictionary defines the transitive verb "to vest" as "to place, settle, or secure (something) in the possession of a person or persons." OXFORD ENGLISH DICTIONARY (online version, 2026), *https://www.oed.com* (last visited March 18, 2026). Meanwhile, Black's Law Dictionary provides alternative definitions for the term "vest," including "to confer ownership (of property) on a person," "to invest (a person) with the full title to property," and "to give (a person) an immediate, fixed right of present or future enjoyment." BLACK'S LAW DICTIONARY 1673 (12th ed. 2024).

Thus, Congress uses vest to describe a transfer. For example, in section 1327 of the Bankruptcy Code, Congress provides that "the confirmation of a plan *vests* all of the property of the estate in the debtor." 11 U.S.C. § 1327(b) (emphasis added); *In re Forte*, 341 B.R. 859, 865 (Bankr. N.D. Ill. 2005) (Black, J.) (finding that, without an additional mechanism, "upon confirmation all property of the estate would appear to vest in the debtor and not be available to creditors."). Similarly, under section 1322 of the Bankruptcy Code, which governs the contents of a chapter 13 plan, Congress states that "subject to subsections (a) and (c) of this section, the plan may provide for the *vesting* of property of the estate, on confirmation of the plan or at a later time, in the debtor or in any other entity." 11 U.S.C. § 1322(b)(9) (emphasis added).[2]

---

[2]   As was the case with surrender, most courts have held that a secured lender cannot be forced to accept vesting of property. *In re Sagendorph*, 562 B.R. 545, 558–59 (D. Mass. 2017) (holding that the plain language of sections 1322(b)(8), (b)(9), and 1325(a)(5)(C) precludes forced vesting); *Sherwood*, 2016 WL 355520, at *7 ("[T]he Court is persuaded by the emerging line of cases, exemplified by *Rose*, *Malave*, *Watt II*, *Williams*, and *Weller*, which hold that a Chapter 13 plan may not be confirmed over the objection of a secured creditor where the plan proposes to vest title to surrendered property in that creditor."); *HSBC Bank USA, N.A. v. Zair*, 550 B.R. 188, 203–04 (E.D.N.Y. 2016) (finding that forcing vesting on the secured creditor was "inherently inconsistent with and impermissibly impede[d] upon the creditor's rights sought to be preserved in § 1325(a)(5)"); *Tosi*, 546 B.R. at 490–92 (finding that lacking the creditor's consent, a Chapter 13 plan that proposes to vest title of the property in that creditor cannot be confirmed); *Williams*, 542 B.R. at 514 ("[V]esting of property in creditor over its objection would force creditor to accept title and impermissibly impose unbargained-for obligations on it . . . in a manner not contemplated by the Bankruptcy Code."); *In re Malave*, Case No. 13-13348 (ALG), 2014 Bankr. LEXIS 5383 at *3–4 (Bankr. S.D.N.Y. Apr. 11, 2014) (refusing to confirm a plan over the creditor's objection to the vesting provision, reasoning that the debtor cannot require the creditor to accept title to the surrendered property); *Watt*, 2015 WL 1879680, at *6 (finding

8

It is clear, therefore, that Congress intended for debtors to invoke section 1322(b)(9), not section 1325(a)(5)(C), when attempting to transfer an interest in property.

B.        Application to the Issue at Bar

The Debtors' 2010 Plan sought only to surrender the Property under section 1325(a)(5)(C) and that surrender was not accepted by the City. The result is that the Property remained owned by the Debtors even after the 2010 Plan was confirmed the Debtors received their discharge.

That continued ownership might result *in personam* liability for the Debtors as it changes neither the incidents nor obligations of ownership. *Canning,* 442 B.R. at 172 (such as "accruing real estate taxes and the desirability of maintaining liability insurance for the premises."); *see also In re Sciarrino*, Case No. 9:11-BK-05881-FMD, 2013 WL 3465920, at *6 (Bankr. M.D. Fla. July 10, 2013) ("[U]ntil a debtor no longer owns the property in question, he remains liable for … accruing real estate taxes, insurance premiums, and postpetition association fees.").

The Debtor's discharge does not change the result. A discharge in bankruptcy only extinguishes a debtor's *in personam* liability on a claim; it does not affect a creditor's *in rem* rights against property. *See Johnson v. Home State Bank*, 501 U.S. 78, 83–84 (1991). "The discharge injunction prohibits a creditor from enforcing a discharged claim against a debtor *in personam*, but the discharge injunction does not prohibit the creditor from enforcing an *in rem* claim against the debtor's property." *In re Parkland Props., LLC*, 605 B.R. 509, 525 (Bankr. N.D. Ill. 2019) (Cassling, J.).

Further, a claim against the bankruptcy estate can be either *in personam* or *in rem*. *In re Smith*, 675 B.R. 878, 892 (Bankr. N.D. Ill. 2025) (Barnes, J.) ("[A] claim against property, even if exclusively *in rem*, is a valid basis for asserting a claim in a debtor's bankruptcy[.]"). Thus, to the extent the City has valid *in rem* claims against the Property, those claims must be addressed in the Debtors' bankruptcy case. To the extent that the City has *in personam* claims against the Debtors arising out of their continued ownership of the Property, assuming such claims arose after the Debtors received their discharge in 2010, they too are potentially valid claims. It is tautological that those postpetition claims were not discharged and can be asserted. *In re Tolbert*, No. 13BK06829, 2022 WL 2126970, at *2 (Bankr. N.D. Ill. June 13, 2022) (Hunt, J.) ("It is well-established that the discharge order applies to debts arising *before* the filing of bankruptcy in a bankruptcy case and does not discharge post-petition debts."). That means that the Debtors may remain liable for whichever claims by the City that might have arisen since the 2010 Bankruptcy Case. The City's Objection, insofar as it challenges the Plan's treatment of the Property and the City's claims, is well taken.

It should also be noted that the City is correct that the Debtors' Plan attempts to treat the Property as property of the estate, subject to the protections of the automatic stay, while at the same time the Debtors argue that they have no interest in the Property as a result of the 2010 Plan. Were the Debtors to be successful in extending the protections of the automatic stay to the Property as property of the estate, they would be judicially estopped from claiming that their interest in the

---

that nonconsensual vesting frustrates the purpose of the Bankruptcy Code and erodes essential protections afforded to secured creditors). The court has found no cases that hold the opposite that have not been reversed on appeal, and only one case that might be construed to imply a creditor might be forced to accept surrender and vesting. *In re Stewart*, 536 B.R. 273, 277 (Bankr. D. Minn. 2015). Even there, as creditor did not object, the outcome can be seen more simply as in keeping with *Rosa*'s conclusion that implied acceptance may exist in the absence of an objection. *Id.*

9

Property was divested by the 2010 Plan. *In re Legette*, Case No. CV 15-03320-JW, 2015 WL 4507678 at *2 (Bankr. D.S.C. July 22, 2015) ("[T]he plain language of the Code requires that in order for certain property to be afforded the protections of the automatic stay, it must be shown that the debtor has a legal or equitable interest in such property."). Both conditions cannot exist at once.

C.     Application of *Midlantic*

As noted above, the court also requested that the parties address the possible application of *Midlantic* here. In *Midlantic*, the Supreme Court held that the Chapter 7 trustee could not abandon the debtor's property which stored oil contaminated by a highly toxic carcinogen. *Midlantic*, 474 U.S. at 507. In so doing, the Supreme Court placed a condition on the otherwise clear statutory language in favor of the public good, finding that even express statutory language cannot be given full effect "in contravention of state or local laws designed to protect public health or safety." *Id.* at 502; *see also Rose*, 512 B.R. at 796 (stating that a debtor cannot force a secured creditor to accept personal liability for property that is damaged or otherwise a public nuisance or accept title to a property subject to environmental contamination).

The Debtors are incorrect in their contention that *Midlantic* does not apply because Congress has not limited surrender in that way. In *Midlantic*, the Supreme Court imposed a limitation on abandonment over and above the statute's express terms. *Midlantic*, 474 U.S. at 502. Thus, the presence or absence of limitations from Congress is not the point of *Midlantic*. The point is whether a debtor may shift the burdens of public health or safety violations relating to estate property to the state. The Supreme Court's answer was clear—a debtor may not. In that regard, the holding of *Midlantic* is broad enough to encompass other mechanisms in the Bankruptcy Code that might achieve that same result.

The Debtors are correct, however, that *Midlantic* is about abandonment, not about surrender or vesting. But that distinction does not favor the Debtors. Abandonment does not require a recipient as abandonment is not, in and of itself, a transfer. It is an extinguishment of the estate's rights in property.[3] As both surrender and vesting require acceptance by the secured creditor, there should be no situation in which a debtor could force the state into the position forbidden by *Midlantic*. Thus, the court agrees with the Debtors that *Midlantic* is inapplicable here.

CONCLUSION

For the foregoing reasons, the Objection must be and is sustained. The Debtors' surrender of the Property in the 2010 Plan did not change their ownership interest. Because the Debtors own

---

[3]     Section 554 of the Bankruptcy Code states that "the trustee may abandon any property of the estate that is burdensome to the estate or that is of inconsequential value and benefit to the estate." 11 U.S.C. § 554(a). Such abandonment, however, simply removes the estate's interest in property of the estate. *In re Buckner*, 224 B.R. 760, 762 (Bankr. E.D. Mo. 1998). The abandoned property ceases to be property of the estate and thereby reverts to whatever party had an interest in such property before the estate acquired its interest. *See In re Jones*, 657 B.R. 238, 252-53 (Bankr. N.D. Ill. 2024) (Cox, J.). Thus, even if a chapter 13 debtor could abandon property, which some courts have held they cannot, *In re Nordike*, Case No. 12-60037, 2013 WL 66262, at *4 (Bankr. S.D. Ill. Jan. 4, 2013) ("It is uncontroverted that the language of § 554(a) permits only a [Chapter 7] trustee to abandon property of the estate."), abandoning property does not effectuate a transfer of the debtor's interest in such property, only an extinguishment of the estate's interests.

the Property, they are potentially responsible for all its accruing liabilities, including any validly asserted claims by the City arising out of their continued ownership of the Property.

Dated: April 10, 2026

ENTERED:

_____
Judge Timothy A. Barnes
United States Bankruptcy Court